Patrick D. Webb
**LAW OFFICES OF PATRICK WEBB**
402 West Broadway Ste 400
San Diego CA 92101
Tel 619-548-4727
Fax 619-236-128
pwebb@webbcarey.com

Receipt number BUSFCC-11381024

Attorneys for Plaintiffs

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HAVASU WATER CO., JUDY CHILDS, RONALD CHILDS, RYAN WEAVER, TINA MCGLOHON, JEFF ARNST, JENNIFER HODGES, ZACHARY BROOKS, VICTORIA FIALA, SAIL INN CAFÉ, HAVASU EXECUTIVE STORAGE, JH FAMILY LTD. PARTNERSHIP, and HHB&H PARTNERSHIP,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, and its DEPARTMENT OF INTERIOR, BUREAU OF RECLAMATION, BUREAU OF LAND MANAGEMENT, and its agent the CITY OF NEEDLES, and DOES 1-20,<br><br>Defendants. | Case No. 26-1071 C<br><br>**COMPLAINT**<br><br>**1) BREACH OF CONTRACT**<br>**2) TAKING**<br>**3) EQUITABLE RELIEF** |

Plaintiffs allege upon information and belief as follows:

## PARTIES

1. This is a water rights and right of way dispute, arising from: (1) the UNITED STATES' ownership and, (2) the U.S. Dept. of Interior (DOI), Bureau of Reclamation (BOR) and its agent, City of Needles, contract sale of Colorado River water for residents in So. California, and

(3) the Bureau of Land Management (BLM's) management of land titled in the name of the UNITED STATES between Lake Havasu and HAVASU WATER CO.'s treatment plant 1500' west of the lake in Havasu Lake, California.

2. HAVASU WATER CO. (HWC) is a public utility water service, franchised by San Bernardino Co. pursuant to Ordinance SD82-1, Government C. §25210 et seq., and Water C. §55000 et seq., with an exclusive water and irrigation district in County Service Area 70, encompassing Havasu Lake, California. HWC currently serves 361 customers, twelve of whom are representative plaintiffs herein, pursuant to Fed. R. Civ. P., Rule 23.

3. Plaintiffs, JUDY CHILDS, RONALD CHILDS, RYAN WEAVER, TINA MCGLOHON, JEFF ARNST, JENNIFER HODGES, ZACHARY BROOKS, VICTORIA FIALA, SAIL INN CAFÉ, HAVASU EXECUTIVE STORAGE, JH FAMILY LTD. PARTNERSHIP, and HHB&H PARTNERSHIP, are residents of Havasu Lake, California, and customers of HWC, who are suing in a representative capacity for the interruption of HWC's 361 customers water service, that depend upon HWC's right of way for all potable water for drinking, cooking, bathing, cleaning, and fire protection in Havasu Lake, California.

4. The UNITED STATES, DOI, and BOR are contractually obligated to supply 100 acre feet of Colorado River water to HAVASU WATER CO. per year, pursuant to Subcontract Number 258 to Contract No. 2-07-30-W0280, a copy of which is attached as Exhibit A. This Subcontract replaces HAVASU WATER CO.'s prior agreements to purchase Colorado River water from the UNITED STATES, DOI, and BOR, through contracts with the San Bernardino Valley Municipal Water District, the Metropolitan Water District of Southern California, and the August 20, 1959, through August 20, 2000, Concession Contract No. 14-16-998-389, with the U.S. DOI's

Bureau of Sports Fisheries and Wildlife, Fish and Wildlife Service, which is now known as the U.S. Fish & Wildlife Service.

5. The CITY OF NEEDLES is the agent for the BOR, and executed the Subcontract Number 258 to Contract No. 2-07-30-W0280 with HWC, on behalf of the BOR.

6. Defendants Does 1 through 20, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiffs at this time. When the true names and capacities of said defendants are ascertained by plaintiffs, plaintiffs will seek leave to amend this complaint to insert their true names and capacities. Plaintiffs are informed and believe, and based thereon allege, that each of the fictitiously named defendants is responsible in some measure for the actions, events and damages herein alleged, and are the agents of each of the defendants.

7. Plaintiffs are informed and believe and on such information and belief allege that at all times herein mentioned, defendants, and each of them, were the agent, employee and/or joint venturer of their co-defendants and defendants, and were acting within the course and scope of such agency, employment and/or joint venture and with the permission and consent of their co-defendants and defendants. Each reference to one defendant is also a reference to each and every other defendant.

**JURISDICTION**

8. Jurisdiction is alleged under 28 U.S.C. §§1331, 1343, 1346(a)(2), 1491, and 2201, the Contract Disputes Act, 41 U.S.C. §§601 and 7103-4, 43 U.S.C. §§390uu, 666, 43 U.S.C. §§945-49, and 1769(a), federal common law, the US. Constitution, Fifth Amendment, and the right to incidental equitable relief following the amendment of 28 U.S.C. §1491(b) to provide an entire remedy and to complete the relief afforded by the judgment, as an incident of and collateral to any

such judgment and to remand appropriate matters to the U.S. Department of Interior with such direction as may be proper and just.

## GENERAL ALLEGATIONS

9. On November 1, 2003, the UNITED STATES, DOI, BOR and the CITY OF NEEDLES, entered into Subcontract Number 258 to Contract No. 2-07-30-W0280. to supply HWC with 100 acre feet of Colorado River water per year, a copy of which is attached as Exhibit A.

10 HWC has paid, and the BOR, through its agent CITY OF NEEDLES, has accepted, payment from HWC pursuant to the terms of Subcontract Number 258. HWC made its most recent payment on July 13, 2026, and the payment was accepted by the BOR and the CITY OF NEEDLES. HWC has consistently paid its fees to the BOR since the inception of the Subcontract, and HWC is in good standing and not in breach of any provisions of the Subcontract, material or otherwise.

11. Paragraph 3 of the Subcontract provides: "Subject to the terms and conditions of this Subcontract, Subcontractor shall have the right to divert Mainstream Water in an amount not to exceed the amount of acre feet per year, and at the point of diversion, listed in Attachment 1, as currently attached or as subsequently amended. The Mainstream Water shall be used for the uses and on the parcels listed in Section II, of Attachment 1," which currently provides for 100 acre feet per year for use on HWC's treatment plant, San Bernardino Co. APN#0649-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.

12. Paragraph 7.1 of the Subcontract provides: "Each of the easements, covenants, conditions restrictions, rights and obligations set forth in this Subcontract shall run with the land and create equitable servitudes and covenants running with the land and in favor of the United States, Needles, and Subcontractor; shall bind every person having any fee, leasehold, or other interest in any of the parcels described in Attachment 2 attached hereto; and shall inure to the benefit of the

respective Parties and their successors, assigns, heirs, and personal representatives. Needles may cause this Subcontract to be recorded with the County Recorder at the County in which the property is located against each parcel listed in Attachment 1 as receiving an allocation of Project Water."

13. Needles recorded the Subcontract with the County of San Bernardino's County Recorder on October 22, 2004, Doc# 2004-0771185.

14. Paragraph 23 of the General Contract Provisions of the Subcontract further provides that: "In accordance with Article 29 of Contract No. 2-07-30-W0280, the delivery of Mainstream Water or the use of Federal facilities pursuant to this Subcontract is subject to Reclamation law, as amended and supplemented, and the rules and Regulations promulgated by the Secretary under Reclamation law. The United States has the right to make determinations necessary to administer Contract No. 2-07-30-W0280, for the delivery of Mainstream Water that are consistent with the expressed and implied provisions of that Contract, the laws of the United States and the State of California, and the rules and regulations promulgated by the Secretary."

15. Paragraph 24 of the General Contract Provisions for the Subcontract, Attachment 2, further provides that the UNITED STATES, DOI, BOR and NEEDLES agreed that HWC's annual right to 100 acre feet of Lower Colorado River Project water "shall be appurtenant to and run with the land for each parcel described in Attachment 1 hereto as authorized to receive Mainstream Water," which is the land upon which HWC's treatment plant is built, as described in Attachment 1 to the Subcontract.

16. In 1959, Congress, pursuant to the Ditch Acts. 43 U.S.C. §§945-49, and 1769(a), granted HWC, a permanent right of way as a public utility, across 1500 x 50' of the lakefront titled in the name of the Untied States, and managed by the Bureau of Land Management, as described in

Concession Contract No. 14-16-998-389, in which to dig a ditch, lay a pipeline and install pumps to divert water from the lake to HWC's fee simple treatment yard 1500' up the hill from the lake.

17. The Ditch Acts, 43 U.S.C. §§946 and 947, provide:

> The right of way [for operation and maintenance of reservoirs, canals and laterals] through the public lands and reservations of the United States is granted to any canal ditch company, irrigation or drainage district formed for the purpose of irrigation or drainage, and duly organized under the laws of any State or Territory...to the extent of the ground occupied by the water of any reservoir and of any canals and laterals and fifty feet on each side of the marginal limits thereof...and... such additional rights of way as the Secretary of the Interior may deem necessary for the proper operation and maintenance of said reservoirs, canals, and laterals...43 U.S.C. §946.
>
> ...thereafter all such lands over which such rights of way shall pass shall be disposed of subject to such right of way.43 U.S.C.§947; *U.S. v. Estate of Hage (Hage I)*, 35 Fed. Cl. 147, 163, 172 (Ct. Cl. 1996).

18. *Hage v. U.S. (Hage IV)*, 51 Fed.Cl. 570, 581-84 (2002), holds that the government "could not deny access to vested water rights for permitted use or diversion to another beneficial use, ...and that the owner...was not required to seek permission from the [government] to maintain it."

19. This right of way is jointly owned and operated by the U.S. and HWC, and explicitly permitted crossing fee lands titled in the name of the U.S., managed by the BLM in the Havasu National Wildlife Refuge, pursuant to 40 Stat. 383; 16 U.S.C. §715(a) and 50 C.F.R. §18.111. The Concession Contract, para. 5(i), provides that "the BOR shall retain complete and exclusive control of the use of the water in Havasu Lake."

20. The Ninth Circuit holds that such an owner of water rights as HWC possesses a right of way over federal refuges and reservations for the purpose of diverting the water for beneficial use by pipelines, ditches and canals. *U.S. v. Estate of Hage,* 810 F.3d 712, 717 (9th Cir. 2016)*, citing Hunter v. U.S.*, 388 F.2d 148, 154 (9th Cir.1967), the 1866 Ditch Act, 43 U.S.C. §661, and the 1891

Ditch Act, 43 U.S.C. §§945-49, [collectively the Ditch Acts] and preserved in the Federal Land Policy Mgt. Act (FLPMA), 43 U.S.C. §1769(a), which expressly provides: "Nothing in this subchapter shall have the effect of terminating any right-of-way or right-of-use heretofore issued, granted, or permitted,"

21. Both the Tenth and Federal Circuits have agreed. *Diamond Bar Cattle v. U.S.*, 168 F.3d 1209, 1214–15 (10th Cir.1999); *Colvin Cattle Co. v. United States*, 67 Fed.Cl. 568, 570 (2005), *aff'd* 468 F.3d 803 (Fed. Cir. 2006). See also, *Baker Ranches v. Zinke*, 625 F.Supp.3d 1080, 1108-10 (D. Nev. 2022), finding the 1891 act provided "a more extensive and secure right of way easement over water conveyances than the 1866 Act," in all reservations and land patents withdrawn from the public domain, where, as here, the Interior Secretary approved the Concession Contract, per 25 U.S.C. §81 and 43 U.S.C. §§945-49.

22. The government may not "prevent all access to such water rights." *Estate of Hage v. U.S. (Hage VIII*), 687 F.3d 1281, 1290 (Fed.Cir.2012). "The ditch rights of way are inherently tied to the water rights, because without the attendant ditch rights of way, the water rights are of no value.... the Ditch Act and Supreme Court precedent clearly establish[] that a private party may have water rights in water on federal land...." *U.S. v. Estate of Hage (Hage Nev.)*, No. 07-cv-01154, *4 (D. Nev. May 16, 2011 and May 23, 2013), quoting *Hage I*, at 163, 172.

23. On June 25, 2026, the C.D. of Cal. entered an interlocutory judgment, over HWC's strenuous objection, without a trial in Case No. 20-471, purportedly ejecting HWC from using its pipeline from Lake Havasu. The C.D. of Cal.'s judgment is void for lack of jurisdiction under Fed. R. Civ. P., Rule 19, in the absence of the UNITED STATES, DOI, BOR, BLM and NEEDLES, which are indispensable parties to that action concerning the rights and obligations of the parties in

that action and whose interests are in conflict with the rights and obligations of the parties to Subcontract Number 258 to Contract No. 2-07-30-W0280. This decision is on appeal in the Court of Appeals for the Ninth Circuit in Case No. 26-795, and remains subject to HWC's motion to transfer the appeal to the Court of Appeals for the Federal Circuit and ultimately remand of the action to the United States Court of Federal Claims.

24. It is undisputed, that there is no alternate source of sufficient potable water to supply HWC's 361 customers, without use of HWC's pipeline in its continuing right of way pursuant to 43 U.S.C. §§945-949 and 1769(a) and the BOR Subcontract. See the undisputed March 31, 2026 Declaration of Gary Hix, registered hydro-geologist, C.D. Cal. Case No. 20-471, ECF#307-2.

25. Without a finding that HWC has a continuing right of way with which to deliver Mainstream Water pursuant to the Subcontract, HWC will be deprived of the ability to serve its 361 customers, who will be completely without potable water for drinking, cooking, bathing, and fire protection in the hottest desert in North America.

26. On June 30, 2026, HWC tendered its written demand to the BOR for confirmation by July 15, 2026, that HWC remains entitled to use its right of way, to cross land owned by the United States, pursuant to 43 U.S.C. §§945-49, and 1769(a), and paras. 23-24 of the General Contract Provisions of its Subcontract Number 258, Attachment 2, to Contract No. 2-07-30-W0280, to deliver its annual right to 100 acre feet of Lower Colorado River Project water, which is appurtenant to and runs with the land upon which HWC's treatment plant is built, as described in Attachment 1 to the Subcontract.

27. To date, the BOR has breached its contract with HWC and failed to confirm that HWC remains entitled to use its right of way, to cross land owned by the United States, pursuant to

43 U.S.C. §§945-49, and 1769(a), and paras. 23-24 of the General Contract Provisions of Subcontract Number 258, Attachment 2, to Contract No. 2-07-30-W0280, to deliver its annual right to 100 acre feet of Lower Colorado River Project water, which is appurtenant to and runs with the land upon which HWC's treatment plant is built, as described in Attachment 1 to the Subcontract.

28. Paragraph 19.1 of the General Contract Provisions of Subcontract Number 258, Attachment 2, provides: "If a party breaches its obligations under this Subcontract, the other Party will have the right to sue for damages directly caused by such breach, and seek appropriate injunctive or other equitable relief in connection with any breach, which may continue in the future."

**FIRST CLAIM FOR RELIEF**

(Breach of Contract)

29. Plaintiffs incorporate by reference paragraphs 1 through 28 of this complaint as though fully set forth herein.

30. By virtue of the acts alleged herein, more particularly set forth above, defendants breached their contracts with Plaintiffs.

31. Plaintiffs performed fully all of the obligations and conditions required of them under the contracts with defendants.

32. As a result of Defendants breach of contract, Plaintiffs have suffered general damages and diminution of value of their rights and benefits in an amount in excess of the jurisdiction of this court, subject to proof at trial, including but not limited to the damage to reputation, property, business, trade, profession and occupation, physical and bodily injury, including but not limited to, anxiety, humiliation, shock, emotional distress, mental anguish and related mental and physical injury, and any and all attorneys' fees, costs and expenses incurred in prosecuting this action.

**SECOND CLAIM FOR RELIEF**

(Taking)

33. Plaintiffs incorporate by reference paragraphs 1 through 32 of this complaint as though fully set forth herein.

34. Plaintiffs are informed and believe and thereon allege that the federal Defendants have unlawfully allowed the taking of the possession and use of both real and personal property to which Plaintiffs have a right to use, occupy and quietly enjoy, including but not limited to its continuing right of way to its treatment plant, without the knowledge, permission or consent of the Plaintiffs.

35. Plaintiffs have demanded that Defendants return said property rights to Plaintiffs, but Defendants and each of them, have refused and continue to refuse to return said property rights.

36. As a result of Defendants' wrongful taking of Plaintiffs' property rights, without just compensation, Plaintiffs have suffered general damages and diminution of value of their rights and benefits in an amount in excess of the jurisdiction of this court, subject to proof at trial, including but not limited to the damage to reputation, property, business, trade, profession and occupation, physical and bodily injury, including but not limited to, anxiety, humiliation, shock, emotional distress, mental anguish and related mental and physical injury, and any and all attorneys' fees, costs and expenses incurred in prosecuting this action.

**THIRD CLAIM FOR RELIEF**

(Incidental Equitable Relief- 28 U.S.C. §§1331, 1343, 1346(a)(2), 1491, and 2201, and the Contract Disputes Act, 41 U.S.C. §§601 and 7103-4, and 43 U.S.C. §§945-49, 1769(a))

37. Plaintiffs incorporate by reference paragraphs 1 through 36 of this complaint as though fully set forth herein.

38. An actual controversy has arisen and now exists between Plaintiffs and Defendants regarding their respective rights, duties and obligations in that Plaintiffs contend that Defendants are liable to Plaintiffs for the breach of the Subcontract and deprivations of their property and Constitutional rights alleged herein, and defendants deny such liability to plaintiffs.

39. Plaintiffs desire a judicial determination of the respective rights of Plaintiffs and Defendants.

40. Such a declaration is necessary, incidental to any award of damages sought, and appropriate at this time so that the parties may ascertain their rights and duties with respect to each other.

41. Plaintiffs have been greatly and irreparably damaged by reason of said Defendant's statutory and contractual deprivations of Plaintiffs' contractual property and Constitutional and civil rights alleged herein, and unless Plaintiffs are incidentally granted equitable relief requested, their property rights will be further irreparably harmed.

42. As a result of the wrongful conduct of said defendants as herein alleged, plaintiffs are incidentally entitled to the equitable relief requested to prevent great and irreparable injury resulting from the infringement and violation of their contractual and Constitutional rights, from the likelihood that Defendants will be unable to respond in damages, and from the difficulty or impossibility to ascertain the exact amount of personal bodily injury and property damage plaintiffs have, and will in the future, sustain. These ongoing and continuing injuries sustained by plaintiffs cannot be fully compensated in damages and plaintiffs are without an adequate remedy at law without the imposition of the requested incidental equitable relief.

WHEREFORE plaintiffs pray for judgment as follows:

1. That plaintiffs be awarded general damages subject to proof at trial, in an amount subject to proof at trial, believed to be in excess of $1,000,000;

2. That plaintiffs be awarded their reasonable attorneys' fees, costs, and expenses in this action;

3. That HWC has a continuing right of way to use its pipeline and pumps that is appurtenant to, and runs with the federal lands through which they have been laid and the land upon which HWC's treatment plant has been built, pursuant to 43 U.S.C. §§945-949 and 1769(a).

4. That plaintiffs be awarded such other and further relief as this court may deem just and proper.

Dated: July 20, 2026

**LAW OFFICES OF PATRICK WEBB**

/s/Patrick D. Webb
Patrick D. Webb,
Attorneys for Plaintiffs

# Exhibit A

# The Recorder-County Clerk Certification

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE PUBLIC RECORD, DOCUMENT NUMBER 2004-0771185 CONSISTING OF PAGES, ON FILE IN THIS OFFICE.

12/13/2021

Bob Dutton
Assessor-Recorder-County Clerk
San Bernardino County, CA

ASSESSOR-RECORDER-CLERK • SAN BERNARDINO COUNTY, CALIFORNIA •

No Fees per Government Code 6103

RECORDING REQUESTED BY:

*The City of Needles, as Administrator of the Lower Colorado Water Supply Project Water*

AND WHEN RECORDED MAIL TO:

*City of Needles*
*LCWSP Coordinator*
*817 Third Street*
*Needles, CA 92363*

Recorded in Official Records, County of San Bernardino
Doc#: 2004-0771185
10/22/2004 10:18 AM

COPY

SPACE ABOVE FOR RECORDER'S USE ONLY

AN AGREEMENT BETWEEN
CITY OF NEEDLES
AND
HAVASU WATER CO.
FOR REPAYMENT OF COSTS AND DELIVERY OF
LOWER COLORADO WATER SUPPLY PROJECT WATER

Title of Document

THIS AREA FOR RECORDER'S USE ONLY

THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
($3.00 Additional Recording Fee Applies)

(Rev. 6/00:ha) (Word/S:/Doc Exam/Cover Sheet)

# SUBCONTRACT BETWEEN CITY OF NEEDLES AND HAVASU WATER CO FOR REPAYMENT OF COSTS AND DELIVERY OF LOWER COLORADO WATER SUPPLY PROJECT WATER

1. THIS SUBCONTRACT NUMBER **258** to Contract No. 2-07-30-W0280, as amended, (hereinafter referred to as "Subcontract") is made this 1st day of November, 2003, between THE CITY OF NEEDLES, CALIFORNIA, a charter city duly organized and existing under and by virtue of the laws of the State of California (sometimes hereinafter referred to as "Needles" and sometimes hereinafter referred to as "Contractor"), and **HAVASU WATER CO**, (hereinafter referred to as "Subcontractor"), who owns the property described in Attachment 1 that is to be benefited and burdened by this Subcontract; Needles and Subcontractor each being sometimes hereinafter individually called "Party," and both sometimes hereinafter collectively called "Parties";

2. SUMMARY CONTRACT:

2.1 This Subcontract is based upon the quantity of Mainstream Colorado River Water ("Mainstream Water"), which includes groundwater hydrologically connected to the Colorado River, to be diverted by the Subcontractor for use on the Property. As such, charges for the use of water, the operation, maintenance, replacement and administration ("OMRA") of the well field facilities, and the annual Standby Charge are based upon the actual or presumed diversion of Mainstream Water. For subcontracting purposes, the minimum quantity of water that will be made available for use on a parcel of land will be presumed to be one (1) acre-foot per year.

2.2 This subcontract is for the delivery of Mainstream Water made available in exchange for water pumped by the Lower Colorado Water Supply Project ("Project") pursuant to

the Lower Colorado Water Supply Act. The following attachments are incorporated into this Subcontract and made a part hereof: the Subcontractor Specifications (Attachment 1); the General Contract Provisions (Attachment 2); and Selected Articles From Contract No. 2-07-30-W0280 (on file with the City of Needles). Defined terms that appear in this Subcontract, if not defined herein, are defined in General Contract Provisions (Attachment 2). Amendments to this Subcontract, or any of its attachments, shall become effective upon approval and execution by the Parties.

3. RIGHT TO DIVERT MAINSTREAM COLORADO RIVER WATER: Subject to the terms and conditions of this Subcontract, Subcontractor shall have the right to divert Mainstream Water in an amount not to exceed the amount of acre feet per year, and at the point of diversion, listed in Attachment 1, as currently attached or as subsequently amended. The Mainstream Water shall be used for the uses and on the parcels listed in Section II of Attachment 1.

4. WATER SCHEDULE: Prior to September 1 of each year, Subcontractor shall submit an Annual Mainstream Water Schedule ("Water Schedule") for the following calendar year. The Water Schedule shall state the amount of Mainstream Water to be diverted at each diversion point. The Water Schedule for the first calendar year is included on Attachment 1. If Needles does not receive a Water Schedule from Subcontractor prior to September 8th of each year for the following calendar year, Needles will schedule Mainstream Water for the Subcontractor for the following year based on the previous year's schedule. Subcontractor shall promptly amend its Annual Mainstream Water Schedule in writing to Needles whenever Subcontractor determines that a significantly different quantity of water than previously scheduled will be used, not to exceed the total amount described in Attachment 1.

5. ANNUAL MAINSTREAM WATER REPORT: Prior to January 31 of each year, Subcontractor shall submit to Needles an Annual Mainstream Water Report on a form

provided by the Needles that will state the amount of Mainstream Water diverted at each point of diversion during the prior calendar year.

6. CHARGES:

6.1 Subcontractor shall pay to Needles a one-time Well Field Repayment charge for each acre-foot of Mainstream Water which the Subcontractor has a right to divert pursuant to the Subcontract, on the terms specified in Attachment 1, due upon execution of the Subcontract.

6.2 Subcontractor shall pay an annual (or monthly) OMRA charge as set by Needles for each acre foot of Mainstream Water scheduled to be diverted by Subcontractor in that year. The initial OMRA charge is set forth in Attachment 1. Needles may modify the charge annually, as necessary, to pay expenses incurred in the OMRA of the project. Needles shall notify Subcontractor in advance of any changes in the OMRA charge.

6.3 Subcontractor shall pay an annual Standby Charge for each acre foot of Mainstream Water authorized for diversion by the Subcontract, but not scheduled to be diverted in that year. The initial Standby Charge is set forth in Attachment 1 and is subject to change annually upon prior notification.

6.4 Needles shall bill Subcontractor once annually the full amount (or, at Subcontractor's option, monthly 1/12 of the annual amount) owed by Subcontractor for OMRA and Standby Charges. Subcontractor shall pay all amounts due within 30 days from invoice date. Late payment shall be subject to delinquency charges, as specified in Attachment 2.

6.5 Upon receipt of any amended Water Schedule, Needles shall adjust the current year's charges accordingly. If the Annual Mainstream Water Report reflects water usage different than that scheduled for the previous year, Needles will adjust the current year's charges to credit or debit, as the case may be, any over or under charges from the preceding year based on any discrepancy between the amount of Mainstream Water scheduled and the amount of

Mainstream Water reported as diverted.

7. COVENANTS RUNNING WITH THE LAND:

7.1 Each of the easements, covenants, conditions, restrictions, rights and obligations set forth in this Subcontract shall run with the land and create equitable servitudes and covenants running with the land and in favor of the United States, Needles, and Subcontractor; shall bind every person having any fee, leasehold, or other interest in any of the parcels described in Attachment 2 attached hereto; and shall inure to the benefit of the respective Parties and their successors, assigns, heirs, and personal representatives. Needles may cause this Subcontract to be recorded with the County Recorder at the County in which the property is located against each parcel listed in Attachment 1 as receiving an allocation of Project Water.

7.2 Upon conveyance of all or any portion of the property described in Attachment 1, Subcontractor shall notify Needles so that this Subcontract can be appropriately amended and a new Subcontract entered into with the new property owner, which Subcontract shall specify the amount of Mainstream Water that may be diverted for use on the conveyed property.

CITY OF NEEDLES Pete Dwyer

By Pete Dwyer
Pete Dwyer, Mayor

ATTEST:
Helen A. Cox
City Clerk

Subcontractor
HAVASU WATER CO

By: Everett L. Hodges
EVERETT L. HODGES

Title: SECRETARY

(SUBCONTRACTOR MUST HAVE SIGNATURE NOTARIZED)

STATE OF CALIFORNIA )
) ss.
COUNTY OF Orange )

On December 2, 2003, before me, Mary J. Miller, a Notary Public in and for said State, personally appeared Everett V Hodges, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Mary J. Miller
Notary Public

MARY J. MILLER
COMM. 1446832
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Term Exp. Nov. 19, 2007

ATTACHMENT 1
Subcontract No. 258

# SUBCONTRACTOR SPECIFICATIONS TO SUBCONTRACT WITH CITY OF NEEDLES FOR REPAYMENT OF COSTS AND DELIVERY OF LOWER COLORADO WATER SUPPLY PROJECT WATER

This Attachment 1, made this 1st day of November, 2003, to be effective under and as a part of Subcontract No. 258 dated August 1, 2003, hereinafter called "Subcontract," shall become effective on the date of its execution and shall remain in effect until superseded by another Attachment 1; Provided, that this Attachment 1 or any superseding Attachment 1 shall terminate by the expiration of the Subcontract.

## I. SUBCONTRACTOR:

Name: HAVASU WATER CO
991 Calle Negocio San Clemente, CA 92674-5378

## II. PARCELS BENEFITTED:

| Parcel No. from Attachment 1 | CRB Reference No. | Assessor Parcel No. (Include County) | Address and/or Public Land Survey system description | Parcel Size (in acres) |
|---|---|---|---|---|
| 1 | 258 | 0649 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 | Sec 36 SE 1/4, T5N/R24E | 0.86 |

## III. POINTS OF DIVERSION:

| Diversion No. | Type of Diversion | Location of Diversion | Parcels Served from Diversion | Type of Metering Device |
|---|---|---|---|---|
| 1 | DOM/COM | On Property | 1 | None |

## IV. TYPE AND AMOUNT OF MAINSTREAM WATER USE:

| Parcel No. | Nature of Use | Total Authorized Annual Water Diversion (in acre-feet) | Amount of Water Diversion Scheduled for Initial Year |
|---|---|---|---|
| 1 | Domestic | 100 | 60 |

## V. REPAYMENT AND OPERATION, MAINTENANCE, REPLACEMENT, AND ADMINISTRATIVE CHARGES:

A. In accordance with section 6 of the Subcontract, the one-time Well Field Repayment Charge for the water to be provided pursuant to the Subcontract is $163 per acre-foot.

Total authorized annual diversion (in acre-feet) 100

@ $163 per acre-foot:

TOTAL REPAYMENT CHARGE **$16,300.00**

Payment Terms: **Net 30 Days**

B. Annual Operation, Maintenance, Replacement, and Administration (OMRA) Charge

Total amount of water scheduled to be diverted (in acre-feet) 60

@ $65 per acre-foot:

TOTAL OMRA CHARGE **$3,900.00**

C. Annual Stand-By Facility Charge for unscheduled and unused water:

Authorized annual diversion (in acre-feet) 100

Less amount of water scheduled to be diverted (in acre-feet) 60

Difference 40

@ standby charge of $15 per acre-foot:

TOTAL STANDBY CHARGE **$600.00**

D. One Time Processing Fee TOTAL PROCESSING FEE **$80.00**

E. Total Amount Due: **$20,880.00**

Remit payment to: Needles Public Utility Authority (NPUA)
817 Third Street
Needles, CA 92363

Note: Please reference sub-contract number on check

RMPUB\RWH\217820

**Attachment 2**
**Subcontract No. 258**

**GENERAL CONTRACT PROVISIONS**
**FOR THE SUBCONTRACT BETWEEN**
**THE CITY OF NEEDLES, CALIFORNIA**
**AND**
**SUBCONTRACTOR**

**FOR REPAYMENT OF COSTS AND DELIVERY OF LOWER COLORADO WATER SUPPLY PROJECT WATER**

1. EXPLANATORY RECITALS:

1.1 WHEREAS, the Lower Colorado Water Supply Act authorized by the United States Congress on November 14, 1986 (hereinafter referred to as "Act"), authorized the Secretary of the Interior (hereinafter referred to as "Secretary"), through the Bureau of Reclamation to construct, operate, and maintain the Lower Colorado Water Supply Project, which is a well field and appurtenant works, (hereinafter referred to as "Project"), with sufficient capacity to annually supply up to 10,000 acre-feet of water for beneficial use which will benefit persons or entities as defined in section 2(b) of the Act, and the Act also authorized the Secretary to contract for the delivery of such water with the payment of the operation, maintenance, or replacement costs allocated to non-Federal beneficiaries to be borne by the non-Federal beneficiaries;

1.2 WHEREAS, the Act also authorized the Secretary to enter into a water exchange contract whereby an equivalent quantity of ground water withdrawn by the Project (which is located in Imperial County, California) would be delivered into the All-American Canal in exchange for a portion of the Colorado River water presently taken by Imperial Irrigation District (IID) and Coachella Valley Water District (CVWD) pursuant to their respective Colorado River rights;

1.3 WHEREAS, on September 10, 1992, the City of Needles ("Needles") and the



8-ER-1870

United States entered into Contract No. 2-07-30-W0280 (available for review at the Needles City Hall) which provides, among other things, that Needles assume the administrative responsibility for non-Federal project beneficiaries within San Bernardino County who are authorized to contract with the United States pursuant to the Act, and to enter into agreements approved by the United States with those beneficiaries for Colorado River Mainstream water;

1.4 WHEREAS, Amendment 1 to Contract No. 2-07-30-W0280 dated July 3, 2002 provides that Needles also assume administrative responsibilities for non-federal project beneficiaries in Riverside and Imperial Counties who are authorized to contract with the United States pursuant to the Act.

1.5 WHEREAS, Subcontractor applied to the Colorado River Board of California ("CRB") in accordance with its *Process and Procedures for Obtaining A Subcontract for Water Under the Lower Colorado Water Supply Act of 1986* to receive Project benefits; the Subcontractor's application received a recommendation from CRB, and the United States directed Needles to enter into a subcontract with Subcontractor;

1.6 WHEREAS, it is the desire of Subcontractor and Needles to enter into this Subcontract to implement Contract No. 2-07-30-W0280, as amended, for the amount of water, purpose of water use and place of use listed on Attachment 1 hereto;

NOW, THEREFORE, in consideration of the mutual and dependent covenants contained herein, the Subcontractor and Needles agree as follows:

2. DEFINITIONS: For the purposes of the General Contract Provisions set forth herein and the provisions set forth in Contract No. 2-07-30-W0280, the following definitions shall apply:

2.1 Act means the Lower Colorado Water Supply Act approved November 14, 1986, which authorized the United States to construct, operate, and maintain the Lower Colorado Water Supply Project.

2.2 Attachment 1 shows (i) the Subcontractor's name and mailing address, (ii) the

land on which Mainstream Water is to be used, (iii) the point(s) of diversion, (iv) the amount of Mainstream Water the Subcontractor is entitled to divert and how it is to be used including initial year's water schedule; (v) the Subcontractor's charges associated with the repayment of the Project well field facilities and operation, maintenance, replacement, and administrative (OMRA) charges associated with this Subcontract for the initial calendar year.

2.4 The Bureau of Reclamation is the Bureau of Reclamation of the United States Department of the Interior.

2.5 CRB means the Colorado River Board of California, or its successor, which represents the State of California to protect its interests and rights in the water and power resources of the Colorado River System.

2.6 The Colorado River Compact means the document signed November 24, 1922, at Santa Fe, New Mexico, pursuant to an Act of Congress approved August 19, 1921 (42 Stat. 171); the Colorado River Compact was approved in section 13(a) of the Boulder Canyon Project Act (45 Stat. 1057).

2.7 The Contracting Officer is the Regional Director of the Lower Colorado Region, Bureau of Reclamation, or his or her duly authorized representative. Unless deemed otherwise, the Contracting Officer shall be the Secretary's authorized representative.

2.8 Decree means the Decree of the Supreme Court of the United States in the case of Arizona v. California, et al., entered March 9, 1964, 376 U.S. 340, as now issued, including the Court's Supplemental Decree entered January 9, 1979 (439 U.S. 419), amended April 16, 1984 (466 U.S. 144), and June 19, 2000, or as may be further modified.

2.9 Domestic Use means the use of water for household, stock, municipal, mining, milling, industrial and other like purposes including recreation but excludes the use of water for commercial agriculture or the release of water solely for generation of hydroelectrical power.

2.10 Functional means having the operational capability to economically provide

Project water in compliance with both the water quantity and quality provisions of the Act.

2.11 Mainstream Water means water drawn or diverted from the main channel of the Colorado River, exclusive of tributaries, downstream from Lee Ferry within the United States (including the areas covered by reservoirs, wetlands, lakes, ponds, and backwaters) and from the permeable materials beneath or adjacent to the main channel and floodplain of the Colorado River that naturally are or can be induced by a pumping well to receive water from the main channel.

2.12 Mexican Water Treaty means Executive A, Seventy-eighth Congress, second session, a treaty between the United States of America and the United Mexican States, signed at Washington, D.C., on February 3, 1944, relating to the utilization of the waters of the Colorado and Tijuana Rivers and of the Rio Grande River from Fort Quitman, Texas, to the Gulf of Mexico; and Executive H, Seventy-eighth Congress, second session, a protocol signed at Washington, D.C., on November 14, 1944, supplementary to the treaty.

2.13 Operating Agency shall mean the entity or entities authorized to assume the operation, maintenance, and replacement responsibility of the Project as approved for that purpose by the Contracting Officer.

2.14 Other Project Beneficiaries are those non-federal persons or entities in San Bernardino, Riverside or Imperial Counties who are entitled to receive Mainstream Water pursuant to the Act.

2.15 Project means a well field and appurtenant works with sufficient capacity to annually supply up to 10,000 acre-feet of water for beneficial use which will benefit persons or entities as defined in section 2(b) of the Act.

2.16 Non-Federal Project Water Users means Needles and all persons or entities that have subcontracted with Needles to obtain an entitlement to use Mainstream Water.

2.17 Regulations mean any regulations adopted by the Secretary for administering

entitlements to the use of Mainstream Water or for administering the Colorado River in Arizona, California, and Nevada.

2.18 Secretary means the Secretary of the Interior or a duly authorized representative.

2.19 Uncontrollable Force is any cause beyond the control of the Party affected. Uncontrollable forces shall include, but are not necessarily limited to, inadequacy of Project water supply, failure of facilities, flood, earthquake, storm, lightning, fire, epidemic, war, riot, civil disturbance, labor disturbance, sabotage, and restraint by court or public authority which by exercise of due diligence and foresight such Party could not reasonably have been expected to avoid.

3. APPLICABILITY OF CONTRACT NO. 2-07-30-W0280, AS AMENDED: All rights, terms, and conditions of this Subcontract are subject to the terms and conditions of Contract No. 2-07-30-W0280, as amended. The terms of Contract No. 2-07-30-W0280, as amended, shall control to the extent of any inconsistency between Contract No. 2-07-30-W0280, as amended, and this Subcontract.

4. TERM OF THIS SUBCONTRACT: Subject to the terms, conditions, and provisions set forth herein, this Subcontract shall become effective on the date first written above and shall remain in effect until the earlier of the following:

4.1 Termination of Contract No. 2-07-30-W0280 pursuant to Section 4 of that Contract.

4.2 Termination of the Subcontract by Needles pursuant to Section 19 herein.

5. DELIVERY OF WATER BY THE UNITED STATES: Mainstream Water will be made available to Subcontractor in accordance with Article 5 of Contract No. 2-07-30-W0280.

6. USE OF MAINSTREAM WATER BY SUBCONTRACTOR: The use of Mainstream Water by Subcontractor shall conform to the purpose of use designated in Attachment 1.

7. SCHEDULING, REPORTING AND ACCOUNTING OF MAINSTREAM WATER

DELIVERIES: All schedules and reports from Subcontractor for Mainstream Water deliveries shall be on forms to be supplied or approved by Needles. Needles scheduling and reporting obligations to the United States shall be in accordance with Article 8 of Contract No. 2-07-30-W0280.

7.1 Subcontractor's first Mainstream Water Schedule is included on Attachment 1 of the Subcontract. Thereafter, the annual schedule shall be submitted in accordance with the remainder of this section.

7.2 Subcontractor shall provide a written annual Mainstream Water Schedule and monthly and annual reports for each calendar year in accordance with the following provisions.

7.2.1 If Subcontractor intends to divert in excess of one acre-foot of Mainstream Water in the next calendar year, Subcontractor shall provide an annual written schedule for Mainstream Water that is to be delivered pursuant to this Subcontract. The Annual Schedule shall include the total amount of Mainstream Water to be diverted at each point of diversion. The total amount of Mainstream Water diverted shall not exceed the total amount of Mainstream Water reserved in Attachment 1. The schedule shall be provided on or before September 1 for the following calendar year upon a form provided by Needles. If Subcontractor does not intend to change the amount of water to be diverted or the points of diversion from the previous year's schedule, a new annual schedule is not required. If Subcontractor fails to timely submit an annual written schedule, Needles may estimate an annual schedule for Subcontractor and charge Subcontractor accordingly pursuant to Section 12 herein.

7.2.2 Subcontractor shall promptly amend its annual water delivery schedule in writing and send the amendment to Needles whenever Subcontractor determines that the previously submitted schedule needs to be amended because a significantly different quantity of water than that previously scheduled could be put to beneficial use.

7.3 If Subcontractor diverts more than one hundred (100) acre-feet of Mainstream

Water per calendar year, Subcontractor shall maintain a monthly record of water diversions at each point of diversion. On or before the fifteenth (15th) day of the month, Subcontractor shall file a full written report of the volume of water diverted at each point of diversion listed in Attachment 1 hereto for the preceding month.

7.4 On or before January 31st of each year, Subcontractor shall file a complete written report upon a form provided by Needles showing the volume of Mainstream Water diverted at each point of diversion during the previous calendar year.

7.5 In the event that Mainstream Water is withdrawn from wells that are not metered, Subcontractor shall use customary and standard engineering practices acceptable to Needles and the Contracting Officer to estimate the volume of water withdrawn from each un-metered well. Needles shall give written approval of Subcontractor's method to determine the estimated use.

7.6 The diversion of any Mainstream Water not previously scheduled and paid in advance by Subcontractor in accordance with the provisions of this Subcontract or the diversion in any calendar year of any Mainstream Water in excess of the scheduled quantity of water available pursuant to this Subcontract may be deemed to constitute a material breach of this Subcontract as well as interference with the performance of the Secretary's functions and responsibilities pursuant to the Colorado River Compact, the Boulder Canyon Project Act, the Act of June 28, 1946 (60 Stat. 338) as well as the functions and obligations of the United States arising from the Mexican Water Treaty.

8. RECEIPT OF MAINSTREAM WATER:

8.1 The amount of Mainstream Water diverted or pumped by Subcontractor shall be limited by the amount indicated in Attachment 1 and in accordance with the amount shown on the Annual Water Schedule submitted by Subcontractor pursuant to Section 7 herein and shall be delivered at surface diversion points in the mainstream and/or wells as shown in Attachment 1.

8.2 Subcontractor shall receive the Mainstream Water to be delivered by the United

States pursuant to this Subcontract at the diversion point(s) shown in Attachment 1 hereto and shall perform all acts required by law or custom in order to maintain control over such water and to secure and maintain the water's lawful and proper diversion from the Colorado River.

8.3 Subcontractor understands and agrees that the interest of the United States in the wells which withdraw Mainstream Water by underground pumping is limited to the quantities and use of Mainstream Water pumped for water accounting purposes pursuant to the provisions of this Subcontract.

8.4 Subcontractor shall install and maintain in a manner satisfactory to Needles and the Contracting Officer all turnouts, gates, checks, pumps, pipelines, equipment, meters, and appurtenances of whatever nature necessary to divert, pump, and transport the Mainstream Water from the point(s) of diversion to the place(s) of use.

8.5 The pumping, diversion and conveyance of Mainstream Water by Subcontractor to the place of use shall be without any expense to or obligation of the United States or Needles.

9. MEASUREMENT OF MAINSTREAM WATER:

9.1 All diversions of Mainstream Water greater than one acre-foot per year shall be measured at the diversion and/or well sites by measuring devices acceptable to Needles.

9.2 All measuring and controlling devices or automatic gages shall be furnished, installed, and maintained in a manner satisfactory to Needles and without any expense to the United States or Needles.

9.3 If for any reason the measuring devices shall, in the opinion of Needles, fail to operate satisfactorily, Needles will determine from the best information available the amount of Mainstream Water received by Subcontractor pursuant to this Subcontract.

9.4 Needles may inspect the measuring devices, or arrange to have the measuring devices inspected, to determine the accuracy and the condition of the measuring devices. If the

measuring devices are found to be defective or inadequate, and upon notification by Needles, Subcontractor shall promptly make any and all necessary repairs to or replacement of the measuring devices. If Subcontractor neglects or fails to make the necessary repairs or replacement, Needles may cause the repairs to be made. The expense of re-inspection and the cost of those repairs shall be paid by Subcontractor within thirty (30) days following receipt of a bill of collection from Needles, or, in the alternative, Needles may terminate this Subcontract pursuant to Section 19.

10. NO GUARANTEE OF AVAILABILITY OF WATER: Needles does not guarantee the availability of Mainstream Water pursuant to Subcontract. Subcontractor acknowledges that the long term function of the Project is not assured; that the pending lining of the All-American Canal or other actions may render the Project nonfunctional by eliminating the source of replenishment of the groundwater from which the Project pumps; that State agencies are aware of this possibility and, pending appropriate funding, will evaluate alternatives to maintain the long term viability of the Project or acquire a replacement source of water for Project subcontractors; but that there is no obligation or warranty that they will do so.

11. QUALITY OF MAINSTREAM WATER: Needles does not warrant the quality of the Mainstream Water delivered to Subcontractor and is under no obligation to construct or furnish water treatment facilities to maintain or improve the quality of water.

12. CHARGES FOR PROJECT FACILITIES: Subcontractor shall pay all costs which are allocable to Subcontractor for the construction of the Project, administration, operation, maintenance, and replacement of the Project well field facilities, and the administrative costs associated with this Subcontract. Project costs shall be allocated among all Non-Federal Project Water Users, including Subcontractor, based on consumptive use of Mainstream Water.

12.1 Well Field Repayment Charge. Subcontractor's allocable share of the cost of the construction of the Project's Well Field, plus interest, is set out in Attachment 1. Subcontractor

shall pay the Well Field Repayment Charge upon execution of the Subcontract or pursuant to the payment term set out in Attachment 1.

12.2 Annual Operation, Maintenance, Replacement and Administration (OMRA) Charge. Subcontractor shall pay its annual allocable share of the cost of the operation, maintenance, replacement, and administration of the Project.

12.2.1 Needles, with the review and approval of the Contracting Officer, shall annually set the Project's annual OMRA charge based on the Non-Federal Project Water Users' share of the total cost of operating and administering the Project and maintaining and replacing the Project's facilities.

12.2.2 At the beginning of each calendar year, Subcontractor's annual OMRA charge shall be calculated based on the amount of Mainstream Water scheduled by/for Subcontractor pursuant to Section 7. The Subcontractor's annual OMRA charge shall be adjusted as necessary to reflect changes in Subcontractor's water schedules and shall be reconciled annually to actual diversion reported by Subcontractor and/or determined by Needles pursuant to Section 7. Any excess/shortfall in Subcontractor's payments of the annual OMRA charge shall be carried forward into and charged/credited in the next calendar year.

12.3 Annual Standby Charge and one time processing fee. In addition to the annual OMRA charge, Subcontractor shall be charged a standby charge ("Standby Charge") of $15.00 per acre-foot of Mainstream Water which Subcontractor is entitled to use as described in Attachment 1, but which Subcontractor has not scheduled for delivery in the calendar year. The Standby Charge shall be billed together with the OMRA charge, if any. Needles, with review and approval of the Contracting Officer, may change the Annual Standby Charge from time-to-time in order to properly allocate project costs. Additionally, a one time processing fee of $80 dollars shall be charged to each subcontract to cover postage, billing, recording, and related expenses.

12.4 Needles shall bill Subcontractor monthly (or once annually, at Subcontractor's option) for its prorated OMRA and Standby Charges. Payment is due thirty (30) days from the invoice date. Charges for delinquent payment shall accrue pursuant to Section 18 herein. Delinquent payment may constitute grounds for termination of the Subcontract, and forfeiture of Subcontractor's rights to use Mainstream Water under the Subcontract, pursuant to Section 19 herein.

12.5 Needles shall annually account for all costs incurred in its administration of the Project, including payments to IID for the Non-Federal Project Water Users' share of OM&R and amounts owing to the United States, and all receipts from Non-Federal Project Water Users. Any shortfalls or excesses of expenditures over receipts shall be carried forward and allocated to Non-Federal Project Water Users, as appropriate, in the following year.

12.6 With respect to annual accounting, Needles shall comply with Article 36 of Contract No. 2-07-30-W0280. Subcontractor has the right, upon reasonable notice to Needles and during normal business hours, to review the books and records of Needles covering Needles' services pursuant to this Subcontract. Any concerns regarding amounts charged by Needles to Subcontractor shall be directed initially to Needles. Any dispute between Needles and Subcontractor shall be resolved in consultation with the Contracting Officer as defined in and pursuant to the provisions of Contract No. 2-07-30-W0280 and this Subcontract.

13. <u>FIVE (5)-YEAR REVIEW</u>:

13.1 Needles, in conjunction with the Contracting Officer, reserves the right to re-examine, at five (5) year intervals beginning ten (10) years after the effective date of this Subcontract, the existing and potential water uses and needs of Subcontractor for the beneficial use of Mainstream Water.

13.2 If the Contracting Officer determines that Subcontractor's entire entitlement has not been or may not be beneficially used, the Contracting Officer may direct Needles to reduce

the amount of Mainstream Water Subcontractor is entitled to divert pursuant to the Subcontract as may be necessary, and Needles shall revise Attachment 1 accordingly. Prior to such reduction, a notice will be given to Subcontractor and Subcontractor will be given an opportunity to be heard in accordance with applicable regulations. The Contracting Officer's review will consider factors which include, but are not necessarily limited to, the following factors:

13.2.1 The amount and nature of the Mainstream Water as listed in Attachment 1;

13.2.2 The average unused portion of the Subcontractor's entitlement over the past five (5) years or other appropriate period;

13.2.3 The type and condition of diversion, distribution and delivery works for Mainstream Water and Return Flow Water;

13.2.4 Subcontractor's future growth projections, build-up schedules, per capita consumption, and economic conditions;

13.2.5 Applicable California law, if any, concerning abandonment or forfeiture; a

13.2.6 Facts and circumstances unique to the State of California.

13.3 If it is determined by the Contracting Officer that Mainstream Water has not been or may not be beneficially used, the Contracting Officer may require Needles to reduce the maximum amount of Mainstream Water reserved to Subcontractor to an amount the Contracting Officer determines to be reasonably required for beneficial consumptive use. Subcontractor will be provided an opportunity to appeal the Contracting Officer's decision pursuant to applicable appeal procedures.

13.4 Upon reduction of Subcontractor's entitlement, Needles shall reimburse Subcontractor a corresponding amount of the Well Field Repayment Charge previously paid by Subcontractor. A revised Attachment 1 shall be recorded documenting any reduction in entitlement to Mainstream Water.

Case 5:20-cv-00426-GW-KK Document 81 Filed 12/17/21 Page 135 of 140

14. RIGHTS-OF-WAY:

14.1 Subcontractor hereby grants a right of access to the United States and Needles and their authorized employees, agents, subcontractors, successors, and assigns to enter any lands of Subcontractor for the purpose of inspecting and checking any diversion facilities, including any wells and associated facilities for pumping Mainstream Water from the underground pursuant to this Subcontract.

14.2 Subcontractor will obtain all necessary rights-of-way required for diversion and conveyance of Mainstream Water provided pursuant to the terms and conditions of this Subcontract. Where rights-of-way across lands of the United States are required by Subcontractor's diversion and conveyance, application therefor will be considered by the United States under terms and conditions deemed appropriate by the United States.

15. RELEASE AND INDEMNITY:

15.1 Subcontractor agrees to indemnify and hold Needles, IID, CVWD, and the United States, their employees, agents, subcontractors, successors, or assigns harmless from any loss or damage and from any liability on account of personal injury, death, or property damage or claims of loss or damage or claims for personal injury, death, or property damage of any nature whatsoever for the delivery of Mainstream Water pursuant to this Subcontract.

15.2 Subcontractor hereby releases and agrees that it will hold Needles, IID, CVWD, and the United States, their employees, agents, successors, or assigns harmless from any liability or responsibility whatsoever for the ground-water level associated with the diversion of Mainstream Water or the maintenance thereof.

15.3 Needles, IID, CVWD, and the United States, their employees, agents, subcontractors, successors, or assigns shall not be liable for damages when suspensions or reductions in delivery of Mainstream Water occur for any reason.

15.4 Subcontractor hereby releases and agrees that it will hold Needles, IID, CVWD,

and the United States, their officers, employees, agents, and successors or assigns harmless from any liability or responsibility whatsoever for the reduction of the productive period of the Project, including decisions by the United States to allow for the pumping of unused Project capacity within the limits stated in the Act.

16. INSPECTION OF WORKS BY NEEDLES AND THE UNITED STATES: Needles and the United States, its employees, agents, subcontractors, successors, or assigns shall at all times have the right to inspect all works utilized by Subcontractor or by any water company or other person, firm, or corporation representing Subcontractor in the diversion, processing, storage, and distribution of Mainstream Water delivered pursuant to this Subcontract.

17. GENERAL OBLIGATION--BENEFITS CONDITIONED UPON PAYMENT: The payment of charges becoming due hereunder is a condition precedent to receiving benefits under this Subcontract. Mainstream Water made available pursuant to this Subcontract shall not be furnished to Subcontractor if Subcontractor is in arrears in the advance payment of applicable charges due to be collected by Needles.

18. CHARGES FOR DELINQUENT PAYMENTS:

18.1 Subcontractor shall be subject to interest, administrative, and penalty charges on delinquent installments or payments. When a payment is not received by the due date, Subcontractor shall pay an interest charge for each day the payment is delinquent beyond the due date. When a payment becomes sixty (60)- days delinquent, Subcontractor shall pay an administrative charge to cover additional costs of billing and processing the delinquent payment. Further, Subcontractor shall pay any fees incurred for debt collection services associated with a delinquent payment.

18.2 The interest charge rate shall be the greater of the rate prescribed quarterly in the Federal Register by the Department of the Treasury for application to overdue payments, or the interest rate of one-half (0.5) percent per month prescribed by section 6 of the Reclamation

Project Act of 1939 (Public Law 76-260). The interest charge rate shall be determined as of the due date and remain fixed for the duration of the delinquent period.

18.3 When a partial payment on a delinquent account is received, the amount received shall be applied, first to the administrative charges, second to the accrued interest, and finally to the overdue payment.

19. BREACH OF THIS SUBCONTRACT:

19.1 If a Party breaches its obligations under this Subcontract, the other Party will have the right to sue for damages directly caused by such breach and seek appropriate injunctive or other equitable relief in connection with any breach, which may continue in the future.

19.2 Needles may, but will not be required to, terminate this Subcontract upon the occurrence of any one or more of the following, and pursuant to advice and consent of the Contracting Officer:

19.2.1 Failure of Subcontractor to make any payment to Needles as required in this Subcontract for a period of one hundred eighty (180) calendar days after such payment is due; provided, however, Needles must give Subcontractor written notice of default and Subcontractor will have sixty (60) days after mailing of the notice to cure the default.

19.2.2 Any default by Subcontractor of any term or conditions of this Subcontract, if such default continues for a period of sixty (60) days after mailing of the written notice to Subcontractor of the default. If a default is not reasonably curable within the sixty (60)-day period, Subcontractor will not be considered in default if Subcontractor has, within such sixty (60)- day period commenced with due diligence and dispatch to cure such default and thereafter completes with dispatch and due diligence the curing of such default. Upon termination of the Subcontract for breach, Needles may record a notice of termination of Subcontract against each parcel listed in Attachment 1, which is permitted to receive water pursuant to the Subcontract.

19.3 If Needles terminates the Subcontract for breach, Subcontractor will forfeit all rights under this Subcontract, including its right to delivery of Mainstream Water. Upon such termination, Subcontractor shall not be entitled to a reimbursement for any amounts paid by Subcontractor pursuant to this Subcontract.

20. EFFECT OF WAIVER OF BREACH OF THIS SUBCONTRACT: All rights of action for breach of any of the provisions of this Subcontract are reserved to Needles pursuant to California law. The waiver of a breach of any of the provisions of this Subcontract shall not be deemed to be a waiver of any provision hereof, or of any other subsequent breach of any provisions hereof.

21. WATER AND AIR POLLUTION CONTROL: Subcontractor, in carrying out the provisions of this Subcontract, shall comply with all applicable water and air pollution laws and regulations of the United States and the State of California and shall obtain all required permits or licenses from the appropriate Federal, State, or local authorities.

22. WATER CONSERVATION: Subcontractor shall at all times use Mainstream Water in a manner that is reasonable, beneficial and not wasteful.

23. RULES, REGULATIONS, AND DETERMINATIONS: In accordance with Article 29 of Contract No. 2-07-30-W0280, the delivery of Mainstream Water or the use of Federal facilities pursuant to this Subcontract is subject to Reclamation law, as amended and supplemented, and the rules and Regulations promulgated by the Secretary under Reclamation law. The United States has the right to make determinations necessary to administer that Contract that are consistent with the expressed and implied provisions of that Contract, the laws of the United States and the State of California, and the rules and regulations promulgated by the Secretary.

24. ASSIGNMENT LIMITED--SUCCESSORS AND ASSIGNS OBLIGATED: The rights and obligations of the Subcontract shall be appurtenant to and run with the land for each parcel

described in Attachment 1 hereto as authorized to receive Mainstream Water. The provisions of this Subcontract shall apply to and bind the successors in interest of Subcontractor. Subcontractor may not assign or delegate its rights or obligations under the Subcontract apart from transfer of title to the parcels listed in Attachment 1 hereto.

24.1 Needles may assign its rights and obligations under the Subcontract upon approval only of the United States.

24.2 Upon transfer of title of one or more parcels entitled to receive Mainstream Water pursuant to this Subcontract, Subcontractor and the new owner(s) of said parcel shall apply to Needles for an assignment of/or amendment to this Subcontract and/or for a new subcontract to memorialize transfers of rights and obligations of this Subcontract to the new owner(s) of said parcels. Such request for an amendment, assignment, or new contract shall not be forwarded to contracting officer for approval. A request shall not be unreasonably refused and shall be subject only to payment to Needles in an amount reasonably calculated by Needles to defer its costs of such amendment and transfer. Water assigned to the various parcels under the Subcontract may be reallocated upon request of a transferring subcontracting owner, provided only that each parcel must retain an allocation sufficient to satisfy existing or contemplated uses and be at least one acre-foot per year.

25. NOTICES: Any notice, demand, or request authorized or required by this Subcontract shall be deemed to have been given, on behalf of either Party, when mailed, postage prepaid, or delivered to the other Party at the following addresses:

25.1 City Manager
City of Needles
817 Third Street
Needles, California 92363

25.2 Subcontractor at address listed in Attachment 1.

25.3 Current property owner for the parcel(s) listed in Attachment 1 hereto as listed on the county assessor parcel rolls, if different from Subcontractor.

26. UNCONTROLLABLE FORCES: No Party shall be considered to be in default in respect to any obligation hereunder, if prevented from fulfilling such obligation by reason of an Uncontrollable Force. Any Party rendered unable to fulfill any obligation by reason of an Uncontrollable Force shall exercise due diligence to remove such inability with all reasonable dispatch.

27. ATTORNEYS' FEES: Either party shall be entitled to recover from the other party reasonable costs and attorneys' fees, expert witness fees, costs of tests and analysis, travel and accommodation expenses, deposition and trial transcript copies, court cases and other similar costs and fees incurred in enforcing the provisions of this Subcontract.

28. REMEDIES UNDER CONTRACT NOT EXCLUSIVE: Nothing in this Subcontract shall be construed in any manner to abridge, limit, or deprive either Party of any means to enforce any remedy either at law or in equity for the breach of any of the provisions hereof, or any other remedy which it would otherwise have.